**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Johnny Lee SANDERS,**
**Defendant–Appellant.**

**No. 90–6030.**

United States Court of Appeals,
Tenth Circuit.

March 19, 1991.

Susan L. Foreman, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender with her on the brief), Denver, Colo., for defendant-appellant Johnny Lee Sanders.

Robert E. Mydans, Asst. U.S. Atty. (Timothy D. Leonard, U.S. Atty., and D. Blair Watson, Asst. U.S. Atty., were on the brief), Oklahoma City, Okl., for plaintiff-appellee U.S.

Before McKAY and MOORE, Circuit Judges, and SAFFELS, District Judge.*

SAFFELS, District Judge.

Johnny Lee Sanders, defendant-appellant herein, was convicted in the United States District Court for the Western District of Oklahoma of violating 18 U.S.C. §§ 922(g)(1), 1952(a)(3), 1956(a)(1)(B)(i), 1962(c), 1962(d) and 21 U.S.C. §§ 841(a)(1), 843(b), 846 and 848. Defendant-appellant Sanders raises three contentions of error in this appeal. First, Sanders contends that cumulative evidentiary errors by the trial court (including evidence of uncharged crimes and an improper instruction) adversely affected his right to a fair trial. Second, Sanders challenges his convictions on racketeering charges on the ground that the evidence presented at trial was insufficient to establish the existence of a racketeering "enterprise." Third, defendant contends that his convictions for money laundering should be reversed because the government presented insufficient evidence

---

* The Honorable Dale E. Saffels, Senior United States District Judge for the District of Kansas, sitting by designation.

of concealment or disguise in the two car purchase transactions upon which defendant's convictions were based. For the reasons stated below, we conclude that defendant's convictions under the money laundering statute should be reversed; we will, however, affirm the district court as to the remainder of the issues presented in this appeal.

## I.

Johnny Lee Sanders was charged along with ten other individuals in a 60–count superseding Indictment filed on June 8, 1988. Of the 60 counts, 41 related to Sanders and of those 9 were dismissed before trial. On October 18, 1989, Sanders was tried on the following charges: one count of racketeering, in violation of 18 U.S.C. § 1962(c) (hereinafter referred to as "RICO"), one count of conspiracy to commit RICO in violation of 18 U.S.C. § 1962(d); one count of conspiracy to distribute heroin in violation of 21 U.S.C. § 846; five counts of interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952(a)(3); eight counts of possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1); three counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); eight counts of distribution of heroin in violation of 21 U.S.C. § 841(a)(1); three counts of phone facilitation in violation of 21 U.S.C. § 843(b); one count of possession of a firearm after a conviction in violation of 18 U.S.C. § 922(g)(1); and one count of continuing criminal enterprise in violation of 21 U.S.C. § 848. The trial concluded on November 9, 1989. On November 13, 1989, a jury found Sanders guilty as charged except it acquitted him of the money laundering charge set out in Count 15 and the possession of heroin with intent to distribute charges set out in Counts 6 and 19. On January 11, 1990, Sanders was sentenced to 30 years imprisonment.

## II.

■ Defendant contends that the trial court erroneously admitted evidence of uncharged crimes and evidence which was unfairly prejudicial. Defendant contends that the cumulative effect of these alleged errors, along with an allegedly erroneous limiting instruction, was to deprive him of a fair trial. Generally, a trial court's decision to admit evidence under Rule 404(b) of the Federal Rules of Evidence is reviewed under an abuse of discretion standard. *See, e.g., United States v. Record*, 873 F.2d 1363, 1373 (10th Cir.1989). Although one instance of error may not rise to the level of reversible error, the cumulative effect of two or more individually "harmless" errors may warrant reversal where the substantial rights of the defendant were affected. *United States v. Rivera*, 900 F.2d 1462, 1469–70 (10th Cir.1990) (citations omitted).

■ Upon review of defendant's contentions, we do not conclude on this rather extensive record that defendant's "cumulative effect" argument has any merit. Even assuming, *arguendo*, that evidence of approximately five different uncharged offenses was erroneously admitted by the trial court, generally either a limiting instruction was given in each instance (presumptively curing any prejudicial impact on defendant, *United States v. Peveto*, 881 F.2d 844, 859 (10th Cir.), *cert. denied, Hines v. United States*, — U.S. —, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989)), or the defendant failed to object to the testimony being offered, which operates as a waiver. With regard to the single remaining instance in which evidence relating to uncharged conduct was admitted over a defense objection without the trial court giving a limiting instruction, *i.e.*, one in which a witness mentioned that defendant received stolen property as payment for drugs, (R.Vol. VIII, 632), we do not find that the defendant has demonstrated that the trial court abused its discretion in failing to strike this testimony.[1] In short, the court does not find that defendant has dem-

---

1. We note that defense counsel did not make a formal motion to strike the testimony; nor did he request that a limiting instruction be given.

onstrated the existence of any reversible error in the district court's evidentiary rulings below or that, on this record, the cumulative effect of any alleged error affected defendant's substantial rights. *Rivera,* 900 F.2d at 1470.[2] Thus, defendant's request for a new trial will be denied.

### III.

In his second issue on appeal, defendant contends that the evidence at trial failed to establish the existence of "an enterprise," a necessary element of defendant's convictions under RICO. As stated in *United States v. Hooks,* a single test applies in reviewing the sufficiency of the evidence in criminal cases: "[t]he evidence—both direct and circumstantial, together with reasonable inferences to be drawn therefrom—is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." 780 F.2d 1526, 1531 (10th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986).

"In order to secure a conviction under RICO, the Government must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.'" *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–2529, 69 L.Ed.2d 246 (1981). Under *Turkette,* the existence of an enterprise is proved "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* The issues of ongoing organization, continuing membership and an enterprise existing apart from the underlying pattern of racketeering are factual questions for the jury. *United States v. Ricco-*

*bene,* 709 F.2d 214, 222 (3d Cir.), *cert. denied, Ciancaglini v. United States,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). Although the pattern of racketeering activity and the enterprise are separate elements of a RICO violation, the government need not necessarily adduce different proof for each element. *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528–2529.

[6] Although courts have differed in their views of how separate and distinct the existence of the enterprise must be from the underlying pattern of racketeering, we conclude that the evidence presented in defendant's case was sufficient to establish the existence of a RICO enterprise. For purposes of this appeal, we will employ the Third Circuit Court of Appeal's elaboration of a framework for analyzing the existence of an enterprise as stated in *Riccobene,* 709 F.2d at 222–24.

In this case, we conclude that the evidence establishes the first element stated in the *Riccobene* framework, *i.e.,* an ongoing organization with a decision-making framework or mechanism for controlling the group. 709 F.2d at 222. A witness, Urban Gordon, testified that he was in charge of selling the heroin and Sanders was in charge of maintaining supply, with Gordon and Sanders receiving $18.00 in profit per $30.00 dosage unit. (R.Vol. VII, 375). After Gordon left the organization, other people, such as Ray Gene Jeffries and Elmer Quinn, occupied this same position or role of overseeing street distribution of the heroin while Sanders remained in charge of supplying heroin. (R.Vol. VIII, 546–56, 558–67; R.Vol. VIII, 606, 609). Although the members of defendant's heroin distribution group sometimes

2. Defendant also contends that the court improperly instructed the jury when it gave a limiting instruction concerning evidence of defendant's 1982 arrest for heroin possession. This instruction arose in the context of testimony by a witness (Urban Louis Gordon) that he had given Sanders $40,000 to purchase a large amount of heroin. The witness was then asked, "But the organization never received that heroin, is that correct?", to which the witness responded, "No, no, he got busted at the airport." (R.Vol. VII, 380). The trial court gave a limit- ing instruction, the relevant portion of which reads as follows: "Evidence that the organization, according to testimony being offered, had expectations of receiving a certain amount of product delivered through the airport on that occasion and never got it is relevant and admissible." (R.Vol. VII, 381–82). The defendant did not object to the court's instruction, which could be deemed a waiver. Further, upon review, the court does not find that the trial court's instruction was improper in this case.

changed, the decision-making structure remained the same over time.

The second element of the *Riccobene* framework, *i.e.*, that various associates function as a continuing unit, is shown by the organization's continuation while defendant Sanders was in prison after his parole was revoked upon his arrest in 1982. During his incarceration, Sanders appointed a different person (*i.e.*, Evelyn Pitts) to meet with his heroin suppliers (*i.e.*, Roy and Patricia Williams) to assure a steady supply of heroin for the organization. (R.Vol. VI, 208–14). At trial, evidence was also presented that Sanders continued to have contact with and instruct group members while he was in prison. (R.Vol. VII, 386, Vol. X, 896–908).

▮ The third *Riccobene* element, and the one most contested in this appeal, is that the enterprise is shown to be separate and apart from the pattern of racketeering activity. 709 F.2d at 223; *see Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528–2529. Under *Riccobene*, this element is satisfied if the evidence shows the organization coordinated the commission of different predicate offenses on an ongoing basis. 709 F.2d at 224. Specifically, defendant argues that the evidence failed to establish the existence of a group of associates functioning as a continuing unit with an ascertainable structure that existed apart from the commission of racketeering acts. The government contends that the evidence presented at trial shows that the group continued to exist and thrive on the proceeds of heroin sales without any particular contribution of individuals and conducted numerous predicate acts of racketeering. We find the government's arguments in this regard persuasive, and that the evidence presented was sufficient to establish the existence of an enterprise separate and apart from the racketeering acts. Thus, we conclude that Sanders' second contention on appeal is without merit and that his convictions for RICO and for conspiracy to commit RICO should be affirmed.

## IV.

In his final issue on appeal, defendant Sanders argues that his money laundering convictions based upon two car purchases should be overturned because the evidence was insufficient to establish that these purchases were designed to conceal or disguise drug proceeds. As stated above, in reviewing the sufficiency of the evidence, the test is whether the evidence "both direct and circumstantial, together with the reasonable inferences to be drawn therefrom, is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Hooks*, 780 F.2d at 1531. Further, the evidence presented to support the conviction "must be 'substantial; that is, it must do more than raise a mere suspicion of guilt.'" *United States v. Brandon*, 847 F.2d 625, 630 (10th Cir.), *cert. denied*, 488 U.S. 973, 109 S.Ct. 510, 102 L.Ed.2d 545 (1988) (quoting *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir.1987) (further citations omitted).

Defendant and his wife were convicted of two counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), entitled "Laundering of monetary instruments," (hereafter, "the money laundering statute"). The statute provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> (B) knowing that the transaction is designed in whole or in part—
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; ...
>
> shall be sentenced to a fine ... or imprisonment for not more than twenty years, or both.

Sanders' convictions under the money laundering statute were based upon two car purchases: the November 6, 1986 purchase of a Volvo and the April 24, 1987 purchase of a Lincoln. Defendant argues that these car purchases were ordinary commercial transactions and that the evidence at trial

failed to establish that these transactions were designed to conceal or disguise proceeds from the sale of drugs.

The 1986 Volvo, which formed the basis for Count 14 of the superseding Indictment, was ordered by the Sanderses for Mrs. Sanders on October 18, 1986, less than one month after the Sanders' marriage, using Mrs. Sanders' 1981 Volvo as a trade-in. (R.Vol. XIII, 1419–1421). The Sanderses paid a $500 cash deposit at the time the order was placed. (R.Vol. XIII, 1422). When the Volvo was delivered on November 6, 1986, the Sanderses paid for the car by a combination of $3,535 in cash, which was received from Mr. Sanders, and a $10,000 credit union bank draft. (R.Vol. XIII, 1423, 1425). At the time of the Volvo purchase, Mrs. Sanders was employed by the Oklahoma State Tax Commission and she took out the $10,000 loan from her credit union to purchase the Volvo. (R.Vol. XIX, 2337; Vol. XVIII, 2083). The Sanderses personally handled the transaction to purchase the Volvo and were readily identified by the salesperson with whom they dealt. (R.Vol. XIII, 1417). The salesperson described the approximately $3500 cash payment as a "normal cash transaction." (R.Vol. XIII, 1423).

Defendant's second money laundering conviction (Count 18 of the superseding Indictment) is based upon his purchase of a Lincoln. On April 24, 1987, the Sanderses went to a Lincoln/Mercury dealership and traded in an old Lincoln for a new one, tendering $11,400.00 in cash for the trade-in difference. (R.Vol. XIII, 1358–59, 1363). Mr. Sanders told the salesman that the car was to be titled in the name of his daughter, Denise Sanders. (R.Vol. XIII, 1364–65). Mr. Sanders testified that he titled the car in his daughter's name to obtain lower insurance rates. (R. Vol. XVIII, 2089). Approximately ten minutes thereafter, Denise Sanders arrived at the car lot. (R.Vol. XIII, 1365). In the meantime, Mrs. Sanders had signed Denise's name as purchaser. (R.Vol. XIII, 1368). All three of the Sanderses were readily identified by the Lincoln salesperson with whom they had dealt. (R.Vol. XIII, 1359, 1365). Both the Volvo and the Lincoln were conspicuously used by the Sanderses.

In this appeal, defendant argues that there is insufficient evidence that these car purchase transactions were designed to conceal the identity of the participants to sustain his convictions for violating the money laundering statute. Defendant argues that a necessary element of a violation of the money laundering statute is knowledge that the transaction in question is designed at least in part to conceal or disguise the nature, the source, the ownership, or the control of the proceeds of unlawful activities. Specifically, defendant contends that the undisputed fact that he and his wife were personally present when the cars were purchased and that the Sanderses used the cars conspicuously after they were purchased undermine the element of concealment. Defendant further argues that although the Lincoln was titled in his daughter's name, there remains insufficient evidence of a design to conceal his identity as the source of the proceeds because all three Sanderses, including the daughter, were present when the car was purchased and that, because Denise shared his last name, her connection to him would be obvious. He also argues that the money laundering law was not intended to apply to "ordinary commercial transactions" (albeit by alleged drug dealers) but rather was directed toward transactions designed to conceal the identity of the participants to a transaction (including for example, those transactions where third parties are used to make purchases).

The government essentially presents no arguments to counter defendant's contentions with respect to the Volvo purchase. With respect to the purchase of the Lincoln, the government argues that the design of concealment is evidenced by several facts: that the Sanderses paid $11,400 in cash for the car, and that the Sanderses titled the car in the name of defendant's daughter, that Mrs. (Renee) Sanders signed the purchase agreement for the car as "Denise Sanders," and that Denise Sanders was never observed driving the car. The government's basic position, however, is that the money laundering statute should

be broadly interpreted to include all purchases made by persons with knowledge that the money used for the transaction represents the proceeds of illegal activity.

■ We reject the government's argument that the money laundering statute should be interpreted to broadly encompass all transactions, however ordinary on their face, which involve the proceeds of unlawful activity. To so interpret the statute would, in the court's view, turn the money laundering statute into a "money spending statute." This interpretation would be contrary to Congress' expressly stated intent that the transactions being criminalized in the statute are those transactions "designed to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). Thus, by the express terms of the statute, a design to conceal or disguise the source or nature of the proceeds is a necessary element for a money laundering conviction.[3] In other words, the purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities.

■ Further, we agree with defendant that the evidence of a design to conceal the nature or source of the proceeds used to purchase the cars was insufficient to support his convictions. Clearly, the transaction involving the purchase of the Volvo, and to a slightly lesser extent the purchase of the Lincoln, differ from what could be described as a "typical money laundering transaction" in the Sanderses' failure to use a third party to make the car purchases and thereby conceal the buyers' identities. *See, e.g., United States v. Lee,* 886 F.2d 998 (8th Cir.1989), *cert. denied, Paige v. United States,* —— U.S. ——, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). As outlined above, both defendant and his wife, Renee, were present at these purchases and were readily identified by the respective salespersons involved. Further, both cars were conspicuously used by the Sanderses, making the association of these vehicles with the Sanderses obvious to law enforcement.

■ Although the Lincoln purchase clearly presents a closer case in favor of conviction than the Volvo purchase, we hold that the evidence in connection with the Lincoln purchase was also insufficient to support defendant's conviction. Although defendant titled the Lincoln in his daughter's name, and Mrs. Sanders signed the daughter's name to the car purchase agreement, we conclude that the daughter's presence in person at the car lot during or somewhat subsequent to the transaction, the fact that the daughter shared defendant's last name, and defendant's and his wife's conspicuous use of the car after the purchase, undermine the government's argument (based in large part upon defendant's titling of the car in his daughter's name) that the Lincoln purchase involved the requisite design of concealment.[4]

---

3. The legislative history supports our interpretation of the statute. Senate Report No. 99–433 accompanied Senate Bill No. 2683 which contained the same language as that passed Public Law 99–570, "The Money Laundering Control Act of 1986." 100 Stat. 3207-18. The Senate Report states: "Section 1956(a)(1) is the basic money laundering offense." S.Rep. No. 433, 99th Cong., 2d Sess. 9 (1986). "This section ... appli[es] its coverage to those transactions that can be said to constitute the core of money laundering—transactions designed to conceal or disguise the nature, location, source, ownership, or control of criminal proceeds, or to evade Federal or State cash reporting requirements. This language is intended to include transactions designed to conceal the identity of the participants to the transaction, where it can also

be proved that the funds involved in the transaction are in fact the proceeds of the crime." *Id.* at 10.

4. In support of its argument that the evidence was sufficient to sustain a conviction under the statute with regard to defendant's purchase of the Lincoln, the government cites *United States v. Franklin,* 902 F.2d 501, 510 (7th Cir.), *cert. denied, Mann v. United States,* —— U.S. ——, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990). Although the court finds that this case is somewhat inapposite because the validity of the conviction under the money laundering statute was not at issue in *Franklin,* we further find that *Franklin* is factually distinguishable from the present case. In *Franklin,* defendant Andrea Mann participated

Therefore, because on this record we conclude that the evidence of concealment in connection with defendant's car purchases was insufficient to support his convictions under the statute, defendant's convictions for money laundering (Counts 14 and 18 of the superseding Indictment) will be reversed. In all other respects, the district court is, however, affirmed. We remand this case to the district court to vacate sentence with regard to those counts upon which defendant's convictions have been overturned, in accordance with this opinion.

in at least four activities "related to money laundering." *Id.* These activities included allowing two vehicles that she knew were purchased with proceeds from her brother's drug sales to be titled in her name. She also converted drug proceeds from cash to cashier's checks and back to try to disguise the source of payments on a Mercedes. She also placed her name on safety deposit boxes which were used to store large amounts of her brother's drug proceeds. Thus, the defendant's activities in *Franklin* involved both a greater quantity of activity and activity of a qualitatively different nature than that presented here.